Max Weinstein, Mass. Bar No. 600982
Email: max.weinstein@cfpb.gov
Admitted *Pro Hac Vice*
Tracy Hilmer, D.C. Bar No. 421219
Email: tracy.hilmer@cfpb.gov
Admitted *Pro Hac Vice*
CONSUMER FINANCIAL
PROTECTION BUREAU
1700 G Street, NW
Washington, DC 20552
Phone: (202) 435-9172 (Weinstein)
Phone: (202) 435-7459 (Hilmer)
Fax: (202) 435-5468

Chung H. Han, Cal. Bar No. 191757
Email: chung.han@usdoj.gov
U.S. ATTORNEY'S OFFICE
300 N. Los Angeles St., Suite 7516
Los Angeles, CA 90012
Phone: (213) 894-0474
Fax: (213) 894-7819

*Attorneys for Plaintiff*
*Consumer Financial Protection Bureau*

JONES DAY
Richard J. Grabowski, Bar No. 125666
rgrabowski@jonesday.com
John A. Vogt, Bar No. 198677
javogt@jonesday.com
Ryan D. Ball, Bar No. 321772
rball@jonesday.com
3161 Michelson Drive, Suite 800
Irvine, California  92612.4408
Telephone:  +1.949.851.3939
Facsimile:   +1.949.553.7539

Attorneys for Defendant
EXPERIAN INFORMATION SOLUTIONS, INC.

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Consumer Financial Protection Bureau,

    *Plaintiff*,

    v.

Experian Information Solutions, Inc.,

    *Defendant*.

Case Number:
8:25−cv−00024−MWC−DFM

**[DISCOVERY MATTER]**
**[REDACTED VERSION]**

**JOINT STIPULATION**

Judge: Hon. Douglas F. McCormick
Hearing Date: Mar. 17, 2026
Time: 10:00 AM PST
Courtroom: 6B
Discovery Cutoff: Mar. 27, 2026
Pretrial Conference: Sept. 11, 2026
Trial Date: Sept. 21, 2026

1

**TABLE OF CONTENTS**

2  Plaintiff's Request.................................................................................1

3  Defendant's Response...........................................................................1

4  Plaintiff's Introductory Statement ......................................................5

5  Defendant's Introductory Statement ...................................................7

6  Plaintiff's Statement of the Dispute...................................................11

7     The Requested Consumer Dispute Data ..........................................11

8     The Bureau's Meet and Confer Efforts...........................................12

9     Legal Standard ...............................................................................14

10     The Data is Centrally Relevant to the Bureau's Claims .................15

11     The Request for Dispute Data is Proportional and Not Unduly Burdensome......17

12     A.  Experian has failed to confer in good faith, preventing the parties from

13        meaningfully discussing the technical aspects of producing the database copy

14        or the specific dispute resolution data at issue................................17

15     B.  The request for Experian to produce a backup copy of the CAPS database,

16        or in the alternative to produce the specific Dispute Response and Disclosure

17        Log data, is proportional and not unduly burdensome....................19

18     A Database Copy is Not a Forensic Review of a Computer System ..................23

19  Defendant's Statement of the Dispute ...............................................26

20  I.     Standard ...................................................................................26

21  II.    The Parties' Meet and Confer Efforts.......................................28

22  III.   The Bureau's Request for the CAPS Database is Improper.....................32

23  IV.  The Bureau's Request Would Cause Undue Burden or Result in The

24     Production of Worthless Data..............................................................39

25

26

27

28

JOINT STIPULATION

Pursuant to Local Rule 37-2, Plaintiff Consumer Financial Protection Bureau (the "Bureau") and Defendant Experian Information Solutions, Inc. ("EIS" or "Experian") submit this Joint Stipulation regarding Request No. 1 of the Plaintiff's First Request for the Production of Documents.

Plaintiff's Request

1. A complete copy of the Consumer Assistance Processing System (CAPS) database, not limited to the Applicable Period, including all fields and other information contained therein. This request may be satisfied by the production of the most recent complete copy of the CAPS database that is held offline, i.e. in cold storage.

Defendant's Response

In addition to its General Objections, EIS objects to this Request on the grounds that it is vague and ambiguous in its use of the undefined terms and phrases "Consumer Assistance Processing System (CAPS) database," "fields," "other information," "most recent complete copy," and "cold storage." Even when attributing "ordinary definitions to the terms and phrases utilized," EIS is left to speculate about "what is being sought by these requests," making them "vague, ambiguous, and virtually unintelligible." *Lavco Sols., Inc. v. Biztracker Sys. of St. John, LLC*, 2021 WL 4771803, at *7 (C.D. Cal. Sept. 1, 2021). EIS further objects to this Request to the extent that it seeks information protected by the attorney-client privilege, the attorney work product doctrine, the common interest privilege, or any other applicable privilege or immunity. EIS also objects to this Request on the grounds it seeks confidential, proprietary, and/or trade secret information, particularly where, as here, no protective order has been entered.

EIS further objects that this Request is unlimited in time or scope. Indeed, this Request expressly states it is "not limited to the Applicable Period." Such requests are facially overbroad. *In re Pioneer Corp.*, 2018 WL 4963126, at *6 (C.D. Cal. Aug.

27, 2018) ("[T]he requests were facially overbroad because they were not limited as to time."); *United States v. Real Prop. Located in Los Angeles, California*, 2024 WL 4474862, at *6 (C.D. Cal. Aug. 19, 2024) (same); *Sapan v. Fed. Sav. Bank*, 2024 WL 4002623, at *1 (C.D. Cal. Apr. 30, 2024) (same). As the Bureau's requests state, the relevant time frame is April 12, 2020 through the present. But this request seeks the contents of the CAPS database ad infinitum without regard for the factual allegations in the Complaint. EIS thus objects to the Request to the extent it seeks documents outside the relevant timeframe.

EIS further objects to this Request to the extent the Bureau is already in possession of documents responsive to this Request because EIS produced such documents during the Bureau's Dispute Resolution Examination and/or subsequent investigation, and thus these documents "can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i); *Williams v. Woodford*, 2010 WL 4530160, at *3 (E.D. Cal. Nov. 2, 2010) ("If the documents responsive to the request are already in Defendant's possession, the Court will not compel Plaintiff to produce them because Defendant can obtain the documents from a source that is more convenient, less burdensome, and less expensive."). For the same reasons, EIS objects to this Request "as unreasonably cumulative." Fed. R. Civ. P. 26(b)(2)(C)(i).

EIS further objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are neither relevant to any party's claims or defenses nor proportional to the needs of this case. This case involves the sufficiency of EIS's policies and procedures under the FCRA for conducting reinvestigations of certain types of disputes submitted by a limited number of specific consumers over a definite time period. But this sprawling Request seeks the entire "Consumer Assistance Processing System (CAPS) database."

As the Rule 34 Advisory Committee Notes recognize, there is no "routine right of direct access to a party's electronic information system." Fed. R. Civ. P. 34, Advisory Committee Notes—2006 Amendment. Thus, "[c]ourts should guard against undue intrusiveness resulting from inspecting or testing such systems." *Id.* Following this guidance, "[c]ourts are generally reluctant to permit a party unlimited access to an electronic device in the absence of a discovery violation or the owner's consent." *United States v. California Inst. of Tech.*, 2020 WL 13547790, at *7 (C.D. Cal. Nov. 18, 2020); *Lincoln Benefit Life Co. v. Fundament*, 2018 WL 6133672, at *3 (C.D. Cal. Nov. 7, 2018) (collecting cases and finding plaintiff's requests for unlimited access to electronic devices was not supported by the record). Indeed, "forensic inspection is an extraordinary remedy that requires substantial support, such as when serious questions exist both as to the reliability and the completeness of materials produced." *California Inst. of Tech.*, 2020 WL 13547790, at *7 (clean up and collecting cases); *see also Motorola Solutions, Inc. v. Hytera Commc'ns Corp.*, 314 F. Supp. 3d 931, 939 (N.D. Ill. 2018) ("Forensic examination is generally regarded as a drastic step even in general discovery."); *Bethea v. Comcast*, 218 F.R.D. 328, 329-330 (D.D.C. 2003) ("In the context of computer systems and computer records, inspection or seizure is not permitted unless the moving party can demonstrate that the documents they seek to compel do, in fact, exist and are being unlawfully withheld."); *McCurdy Grp. v. Am. Biomedical Grp., Inc.*, 9 F. App'x 822, 831 (10th Cir. 2001) (describing forensic review as "drastic discovery measure"). Given that discovery has only just began, the Bureau lacks the "substantial support" necessary for its "drastic discovery request." *California Inst. of Tech.*, 2020 WL 13547790, at *8. Additionally, rather than requiring EIS export vast quantities of sensitive consumer data, as the database owner, EIS knows its system capabilities and is best positioned to retrieve the relevant documents or information.

The Bureau's request for a complete copy of CAPS is neither proportional nor proper, particularly since the CAPS database contains sensitive credit information of millions of consumers as well as the processing of consumer disputes that have no relation to this matter. Indeed, the Bureau is effectively asking for all information of every one of the millions of consumer disputes that EIS processed over an indefinite period, irrespective of whether those documents have anything to do with the Bureau's allegations in the Complaint. Taken literally, this Request would yield endless documents, the vast majority of which would be irrelevant to the specific claims or defenses in this case. As a result, discovery seeking information that contains no subject matter limitation corresponding to the actual claims in the Complaint or Plaintiff's circumstances is overly broad and improper. Indeed, such a request amounts to a fishing expedition and is plainly improper. *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 531 (2009) ("Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through . . . records for evidence of some unknown wrongdoing."); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in 'fishing expedition[s].'"); *Risto v. Screen Actors Guild-Am. Fed'n of Television & Radio Artists*, 2020 WL 2225376, at *6 (C.D. Cal. Jan. 8, 2020) ("[T]he Court will not permit what appears to amount to a fishing expedition into documents with little to no apparent probative value."); *Mailhoit v. Home Depot U.S.A., Inc.*, 2012 WL 12884129, at *2 (C.D. Cal. Sept. 4, 2012) ("Where discovery requests seek information which bears no relationship to the subject matter of the complaint, courts appropriately deny enforcement."). Simply put, the Bureau does not have "an unlimited right of access to the [EIS's] papers with reference to the possible existence of practices in violation of" the FCRA. *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305 (1924). As Justice Holmes explained, reaching the contrary conclusion would be "contrary to the first principles of justice to allow a search through all the

respondents' rcords [sic], relevant or irrelevant, in the hope that something will turn up." *Id.* at 306.

Whatever negligble use Plaintiff may envision for these documents, if any, does not justify the time that would be spent or cost that would be incurred in identifying and producing documents in response to this Request in light of the needs of the case. For the same reasons, EIS objects to this Request on the grounds that it is oppressive and intended solely to harass EIS because it would require EIS to search for, review, and produce a substantial amount of information unrelated to Plaintiff's claims in this case.

EIS objects to this Request to the extent it seeks documents which EIS does not maintain in the ordinary course of its business or otherwise asks EIS to create a document for the sake of this litigation. *Terteryan v. Nissan Motor Acceptance Corp.*, 2017 WL 10991656, *6 (C.D. Cal. Oct. 19, 2017) ("A party is not required to create a document in order to respond to a request for production." (collecting cases)); *Goldsmith v. Garfield Beach CVS, LLC*, 2021 WL 11739039 (C.D. Cal. Feb. 16, 2021) (same).

Based on the foregoing objections and General Objections, EIS will not search for or produce documents in response to this Request.

Plaintiff's Introductory Statement

Request No. 1 of the Bureau's First Request for the Production of Documents seeks basic ESI detailing disputes made by consumers regarding the accuracy of information in their Experian credit reports. This ESI provides the specifics of the dispute made by the consumer, the response of the entity (the "furnisher") that furnished the disputed information to Experian, and how Experian ultimately resolved the dispute. Weinstein Decl. ¶¶ 8-9. During the meet and confer process, the Bureau has offered to limit this request to the information contained in two text-based reports within Experian's CAPS database: the Dispute Response or

"D/R" Log and the Disclosure Log. *Id.* ¶¶ 30, 33, 35. In addition, the Bureau offers to limit the time period to July 2, 2020 to present.[1]

The information sought by this request is, fundamentally, the subject matter of the Bureau's claims in this case. The Bureau alleges that Experian violated the Fair Credit Reporting Act ("FCRA") and the Consumer Financial Protection Act ("CFPA") by failing to perform reasonable reinvestigations in response to consumers' disputes. Among other things, the Bureau alleges that Experian: reaffirmed disputed information even when it possessed information in its own files that was internally illogical or inconsistent (SAC[2] ¶ 56); accepted responses from furnishers that were on their face internally inconsistent or illogical (*Id.* ¶ 57); and permitted furnishers to reinsert previously deleted material into consumers' credit files (*Id.* ¶¶ 87-94). The Bureau also alleges that Experian unreasonably accepted information from furnishers that was contradicted by documentation supplied by consumers (*Id.* ¶¶ 54-55); and that Experian sent dispute codes to furnishers that mischaracterized or failed to convey highly relevant information about consumers' disputes (*Id.* ¶ 38).

All of these claims are substantiated by evidence solely in Experian's possession, namely, the dispute data contained in the Dispute Response and Disclosure Logs and sought by the Bureau. The probative value of this evidence is not speculative—█████████████████████████████████████

---

[1] There can be no question that violations occurring on or after July 2, 2020 are actionable, even if the Bureau discovered the violations on the day that they occurred. See 12 U.S.C. § 5564(g)(1); Dkt. 77 (Second Amended Complaint, filed under seal Aug. 28, 2025), ¶¶ 107-24; Dkt. 102, at 2 (Oct. 22, 2025 Order Denying Def.'s Partial Mot. to Dismiss and Mot. to Strike).

[2] "SAC" refers to the Bureau's Second Amended Complaint, Dkt. 72 (public version filed Aug. 22, 2025), 77 (sealed version filed Aug. 28, 2025).

JOINT STIPULATION

1  ████████████████████████████████████████████

2  ██████████████████████████████ Weinstein Decl. ¶ 20.

3      The Bureau now seeks to substantiate its claims, as it is entitled, across the

4  full population of disputes that are encompassed by the Bureau's claims. As noted

5  above, the Bureau has repeatedly emphasized to Experian that the Bureau is only

6  seeking the text-based data contained in the Dispute Response and Disclosure

7  Logs. Because Experian has insisted that its ████████████████████████

8  ████████████████████████████████████████████

9  ██████████████████, the Bureau has proposed instead ████████████████

10 ████████████████████████████████████████████

11 ██████████ *Id.* ¶¶ 30, 33, 35.

12     Experian has flatly refused to produce ████████████████████████

13 and has dragged out the meet and confer process for months, repeatedly ignoring

14 and failing to acknowledge the Bureau's correspondence. And Experian has

15 refused to include a person with technical expertise regarding its systems in any

16 meet and confer, leaving unanswered basic questions about the size and

17 exportability of the necessary data. *Id.* ¶¶ 29, 30, 34. In sum, Experian has failed to

18 justify the claimed burdens of producing this crucial evidence, and the Court

19 should now compel the production of the information maintained in the Dispute

20 Response and Disclosure Logs, in a reasonably usable format, covering July 2,

21 2020 to present.

22 Defendant's Introductory Statement

23     This is no ordinary case. Unlike typical civil litigation—where a plaintiff files

24 suit and must then seek discovery to develop its claims—this matter follows a nearly

25 ████████████████████████████████████████████

26 ████████████████████████████████████████████.

27 During that ████████████████████████████████

28

7

Despite this ███████████████████████, the Bureau now demands even more. Yet the Bureau does not merely seek "more" information—it seeks "all" of it. Indeed, the Bureau requests that EIS produce its entire CAPS database so that the government can review every single consumer dispute that EIS processed since 2020 in an effort to uncover alleged FCRA violations. This sweeping demand encompasses tens of millions of dispute transactions, spanning more than six years of data, untethered to any particular claim or allegation in the Bureau's complaint. It is, in short, a textbook fishing expedition.

The Bureau's request is particularly remarkable given the procedural posture of this case. ████████████████████████████████████████████████████████████████████████████████. In total, ████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████████. But that still was not enough.

After initiating this action, the Bureau renewed its prior demand for data on the tens of millions of disputes Experian received over a nearly 6-year period. The Bureau's unwillingness to narrow its requests in light of its own analysis demonstrates that this is not a search for relevant evidence—it is an "undirected rummaging through" EIS's records "for evidence of some unknown wrongdoing." But this is the same type of sweeping request the Supreme Court rejected more than a century ago.

Like the Bureau here, in *FTC v. American Tobacco Co.*, the FTC claimed "an unlimited right of access to the respondents' papers with reference to the possible existence of practices" in violation of the law. 264 U.S. 298, 305 (1924). As Justice Holmes explained, however, it would be "contrary to the first principles of justice to allow a search through all the respondents' r[e]cords, relevant or irrelevant, in the hope that something will turn up." *Id*. at 306. The same principle applies here. The Bureau's request appears rooted in nothing more than "the possibility that [the CAPS database] may disclose evidence of [wrongdoing]." *Id*. This is precisely the type of fishing expedition that courts have consistently refused to countenance.

The Bureau's extraordinary demand also runs counter to the fundamental principles governing discovery under the Federal Rules. Rule 26(b)(1) makes clear that relevancy alone is no longer sufficient—discovery must also be proportional to the needs of the case. As Chief Justice Roberts has emphasized, "lawyers must size and shape their discovery requests to the requisites of a case," and that the pretrial process "must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery." *Bresk v. Unimerica Ins. Co*., 2017 WL 10439831, at *2 (C.D. Cal. Nov. 16, 2017) (quoting John Roberts, 2015 Year-End Report on the Federal Judiciary 6 (Dec. 31, 2015)). The Bureau's request for the entire CAPS database flagrantly violates these principles. It would require EIS to produce vast quantities of irrelevant consumer data, invade the

privacy of millions of consumers whose disputes were properly handled, and impose extraordinary costs and burdens on EIS—all so the Bureau can conduct an unguided search for additional alleged violations that it has been unable to identify after years of investigation.

Moreover, the Bureau's request ignores the Rule 34 Advisory Committee's admonition that there is no "routine right of direct access to a party's electronic information system." The Advisory Committee cautioned that courts "should guard against undue intrusiveness resulting from inspecting or testing such systems." Courts have consistently recognized that forensic inspection or database access is "an extraordinary remedy that requires substantial support, such as when serious questions exist both as to the reliability and the completeness of materials produced." *United States v. California Inst. of Tech*., 2020 WL 13547790, at *7 (C.D. Cal. Nov. 18, 2020). No such showing has been made here. The Bureau has not identified any discovery violation by EIS, nor has it suggested that EIS's discovery responses have been incomplete or unreliable.

Even setting aside these serious legal objections, the Bureau's request is fundamentally misguided because it will not result in usable discovery. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

Simply put, the Bureau's request is overbroad, disproportionate, and contrary to the Federal rules. Its motion should be denied.

Plaintiff's Statement of the Dispute

*The Requested Consumer Dispute Data*

Bureau Request No. 1 only seeks text-based data contained in the Dispute Response and Disclosure Logs generated by Experian's Consumer Assistance Processing System (CAPS) database.[3] ████████████████████████

████████████████████████████████████

Weinstein Decl. ¶ 8. ████████████████████████████████

████████████████████████████████████

████████████████████ *Id.* The CAPS system contains, among other things, the following information in text format:

- ████████████████████████
- ██████████████████████
- ████████████████████████
- ██████████████████████████████
- ██████████████████████████
- ████████████████████
- ██████████████████████████████████
- █████████████████████████████
- ████████████
- ██████████████████████████

All of the above information is contained in one of two reports that the CAPS system can produce for any given dispute: the Dispute Response Log or the Disclosure Log. *Id.* ¶ 9; Petron Decl. ¶¶ 13-16.

---

[3] The Bureau has reiterated the intended meaning of its request numerous times in writing. *See, e.g.*, Exhibit M to Weinstein Declaration (Letter dated September 4, 2025, at 1-2, stating "Bureau Request 1 seeks production of the same kinds of data that were produced in the investigation—i.e., contents of the DR log and disclosure log for disputes found in the CAPS database.").

11

1



*The Bureau's Meet and Confer Efforts*

The Bureau served its first requests for production of documents on June 20, 2025. *Id.* ¶ 22. Experian asked to extend the deadline for responses by two weeks, and the Bureau agreed. *Id.* ¶ 23. On August 4, 2025, Experian objected to the entirety of Request No. 1 on numerous grounds, including the claim that such a request is only permissible in the context of a forensic inspection. *Id.* ¶ 25. Experian flatly refused to search for or produce any ESI responsive to the request. The Bureau promptly requested to meet and confer regarding Request No. 1. The

Bureau proposed that the parties include individuals with relevant technical expertise in the meet and confer, but Experian refused to make any such person available. *Id.* ¶¶ 26, 29. The parties met and conferred on August 15, 2025, but reached no agreement on Request No. 1. *Id.* ¶ 30. Bureau counsel explained that Request No. 1 sought the contents of the Dispute Response and Disclosure Logs reports for a reasonable time period and ███████████████████████ ████████████████████████████████████████████████ ████████████████████████. *Id.* Because of the absence of a technical expert, Experian's counsel was unable to address whether copying a ██████████████████ would be feasible or less burdensome and could not answer any other technical questions regarding its databases. *Id.*

Following this meet and confer, the Bureau made additional, written inquiries regarding the questions Experian's counsel had been unable to answer, but Experian ignored that correspondence and did not respond to those inquiries. *Id.* ¶ 32. Experian's refusal to respond to the Bureau's inquiries required the Bureau to send a pre-motion letter pursuant Local Rule 37-1, which the Bureau sent by email on October 14, 2025. *Id.* ¶ 33. The Bureau again requested the presence of an Experian representative with relevant technical expertise at the meet and confer, and Experian again refused. *Id.* ¶¶ 33-34. The parties met and conferred on the first day Experian was available, October 27, 2025. At the meet and confer, Experian was again unable to answer the Bureau's technical questions, but suggested that the Bureau could either pose technical questions at a Rule 30(b)(6) deposition or send written questions by email. The Bureau sent its unanswered questions by email to Experian on November 3, 2025. *Id.* ¶¶ 34-37.

Experian responded on November 25, 2025, but failed to answer all of the Bureau's questions, including whether the Dispute Response Log and Disclosure Log data is segregated within its databases, the approximate size of that data, how

13

the data is structured, the role of proprietary software (e.g., front-facing application or backend), and whether it would be more expeditious for Experian to export by date range. *Id.* ¶ 39. ██████████████████████████████████████ ████████████████████████████████████████. *Id.* Experian represented in its e-mail that ████████████████████████████ ████████████████████████████████████████ ████████ *Id.* In other words, Experian claims that despite ██████████████ ████████████████████████████████████████ ████████████████████. And Experian evaded the question whether the Dispute Response and Disclosure Log datasets *within* the larger CAPS database can be copied or exported.

*Legal Standard*

Under Federal Rule of Civil Procedure 26, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "Ninth Circuit law generally favors a broad scope of discovery. '[W]ide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for truth.'" *Dysthe v. Basic Rsch., LLC*, 273 F.R.D. 625, 628 (C.D. Cal. 2011) (quoting *Epstein v. MCA, Inc.*, 54 F.3d 1422, 1423 (9th Cir.1995).

Thus, the relevance standard "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). Once the requesting party has established relevance, "[t]he party who resists discovery has the burden to show that discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *DIRECTV, Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002).

To determine whether a request is proportional and not unduly burdensome, courts may consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Neither the inadequacy of a party's filing system or the fact that responsive documents may be voluminous suffice to sustain a claim of undue burden. *See Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033 (E.D. Cal. 2010).

*The Data is Centrally Relevant to the Bureau's Claims*

The information sought in Request No. 1, and clarified in the Bureau's subsequent communications, is directly relevant to the Bureau's core allegations against Experian. For example, the SAC alleges, among other things, that:

- "Experian frequently possesses relevant supporting information in *its own consumer files* that should alert it to a furnisher's unreliability." SAC ¶ 56.
- "Experian frequently receives furnisher responses that contain data that is either illogical or facially and internally inconsistent, but it still accepts the furnisher's response without further reinvestigation into the dispute." *Id.* ¶ 57.

The Dispute Response and Disclosure Log data contains precisely the admissible evidence pertinent to the Bureau's allegations. ██████████████ ████████████████████████████████████████████████ ████████████████████████ This log data is essential to enable the Bureau to search for and identify furnisher responses that contain illogical or facially inconsistent data and disputes where Experian possessed information in its own resolution database that supported or corroborated the consumer's dispute. ████████████████████████████████████ ███████████████████████████████████████ The

15

SAC provides an example of a furnisher response that is illogical and facially and internally inconsistent: a response that indicates a "a consumer's overdue balance is *greater* than the total amount due." *Id.* ¶ 58. ████████████████

██████████████████████ the Bureau has been able to identify numerous additional disputes meeting this description and has identified those disputes in its responses to Experian's interrogatories. Weinstein Decl. ¶¶ 19-20.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ *See* Petron Decl. ¶¶ 20-23. The Bureau now seeks and is entitled to data covering the entire actionable time period (July 2, 2020 to the present) that will enable it to search for **all** illogical and inconsistent furnisher responses and instances where Experian possessed, but ignored, information corroborating consumers' disputes. *See, e.g.*, *Albert v. Lab'y Corp. of Am.*, 536 F. Supp. 3d 798, 801 (W.D. Wash. 2020) ("A reasonably accessible electronic document that is responsive to a discovery request is no different than a reasonably accessible paper document and must be produced without regard to the parties' agreement to use search terms.").

Additionally, the Bureau needs a complete dataset for purposes of designing a statistically-valid random sample of disputes for a more detailed manual review. While the Bureau will be able to identify a number of Experian's FCRA violations by querying the complete dataset of consumer disputes, certain violations will also require a more in-depth review on a dispute-by-dispute basis. For instance, the Bureau anticipates it may not be possible to easily query the payment history that appears in the CAPS data and whether it corroborates consumers' claims that they

made certain payments or settled their accounts—this may require a review of the documents associated with the dispute. Given the volume of Experian's disputes, the Bureau will likely need to review a statistically valid random sample to determine the prevalence of this and similar violations. Designing a proper, statistically valid sample will require accounting and adjusting for various distorting factors and biases in the data, including seasonal biases, pandemic-related distortions and other outliers. This analysis will necessarily require accessing and reviewing data relating to the entire population. Petron Decl. ¶¶ 24-30.

*The Request for Dispute Data is Proportional and Not Unduly Burdensome*

A. Experian has failed to confer in good faith, preventing the parties from meaningfully discussing the technical aspects of producing the database copy or the specific dispute resolution data at issue.

At the outset, the parties' ability to discuss and consider the scope of production—of either the database backup or the specific dispute log data—has been crippled by Experian's repeated failure to engage in good faith discussions. As the Sedona Conference's most recent guidance on discovery concerning databases states, "[a]t a minimum, parties participating in the discovery of database information should familiarize themselves with several basic database attributes so that they have adequate knowledge and understanding to develop reasonable procedures for preserving and producing information from these repositories." The Sedona Conference, *Database Principles Addressing the Preservation and Production of Databases and Database Information on Civil Litigation*, July 2025 Public Comment Version, at 19-20 (hereinafter "Sedona Conference 2025 Database Commentary").[4] Responding parties' obligations include "understand[ing] the

---

[4] www.thesedonaconference.org/sites/default/files/publications/Commentary%20

features—and shortcomings—of the database engines that power their information repositories," as well as the structure and format of the data, and the use of third party applications. *Id.* at 25. As such, "[a] responding party may not be able to meet its database discovery obligations without solid knowledge of these tools and their potential application to the party's relevant databases," making it "difficult for a responding party to fully understand, much less articulate, the burden that a given discovery request imposes" and "greatly limit[ing] a party's ability to have comprehensive, frank discussions about database discovery." *Id.*

That is exactly what has happened here. Experian has failed to provide basic information about the relevant data repositories, and the representations it *has* made are exclusively about what it *can't* do—despite repeated inquiries, it has refused to answer questions that would potentially allow the parties to devise a workable compromise. While the federal rules do not require the presence of an outside technical expert at a meet and confer, they do require *someone* with knowledge to attend.[5] Dialogue over the production of a database copy, or data

on%20Addressing%20Databases%20in%20Civil%20Discovery%2C%20Public%20Comment%20Version.pdf

[5] Experian counsel's assertion that technical specialists never attend meet and confers is inconsistent with both the Bureau's experience and the Sedona Conference's guidance on database discovery. *See, e.g.*, Sedona Conference 2025 Database Commentary, at 50 (observing, with respect to meet and confer principle, that "[i]nvolving technical representatives from each side can often avoid litigation gamesmanship and focus the discussion on practical solutions."); *see also* The Sedona Conference, *The Sedona Principles, Third Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production*, 19 Sedona Conf. J. 1 (2018), at 86 ("Indeed, because of the continuing evolution, proliferation, and complexity of information generating and storage systems, several courts encourage counsel to bring their client's technical experts to Rule 16(b) and Rule 26(f) conferences, so that erroneous assumptions and understandings about ESI functionality, including export options, costs, and time estimates, can be dealt with intelligently and early, rather than sidetracking the discovery plan or, worse, leading to costly motion practice.").

JOINT STIPULATION

compilations from the database, has been made impossible by the absence of anyone from Experian—whether counsel, an employee, or other individual—who could actually answer technical questions and evaluate options, such as the feasibility of exporting certain tables and fields for a particular time range. That is why the Bureau requested that someone with technical knowledge attend the conferences. And Experian's failure to do so, or to gain the knowledge necessary to competently discuss the relevant data systems, has prevented the parties from resolving this dispute without Court intervention.

Experian should not be rewarded for its failure to meaningfully engage in discovery discussions. As discussed below, based on the available information, the Bureau's request is reasonable, proportional, and not unduly burdensome. The Court should therefore require Experian to produce the requested data.

B. The request for Experian to produce a backup copy of the CAPS database, or in the alternative to produce the specific Dispute Response and Disclosure Log data, is proportional and not unduly burdensome.

Based on the limited information the Bureau has, the production of the Dispute Response and Disclosure Log data for the actionable period is reasonably proportional (particularly given its central importance to the case) and is not unduly burdensome.

First, the size of the Dispute Response and Disclosure Log data is manageable. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████

JOINT STIPULATION

1

2

3

4

5

6

7    ██████████████    But when asked about the size of the Dispute Response and

8    Disclosure Log information—the structured data that the Bureau has repeatedly

9    stated it was seeking through Request No. 1—Experian's counsel did not have an

10   answer.

11          Second, the Bureau is entitled to a full set of data covering at least the period

12   from July 2, 2020 to present. For example, the data is necessary to identify illogical

13   and inconsistent furnisher responses, as well as instances where Experian already

14

15   [6] ████████████████████████████████████████████

16   ████████████, but the Bureau has repeatedly told Experian, to no avail, that it
     would discuss a data production covering a shorter time period if doing so would
17   reduce Experian's burden.

18   [7] Experian's claims that it faces onerous export constraints is at odds with the basic
     function of a relational database. "The purpose of a relational database is to make
19   large amounts of data accessible and usable," and the "mere fact" that a database
     may house a large volume of data "does not necessarily translate into an undue
20   burden." *Manassa v. NCAA*, No. 1:20-cv-03172-RLY-MJD, 2023 WL 1765993, at
21   *4 (S.D. Ind. Feb. 3, 2023). Additionally, as explained by the Bureau's data
     analytics expert, Michael Petron, the particular database engine that Experian uses
22   to manage the data ██████████ is widely used to manage relational databases and
     includes numerous tools that facilitate administrative tasks, including data
23   retrieval. Petron Decl. ¶¶ 31-42.
24   [8] Other Bureau document requests do seek ESI associated with consumers'
     disputes, such as .pdf files and images of documents supplied by consumers or
25   other sources, that is not structured data. But the Bureau anticipates limiting its
26   requests for those materials based on a statistical sample of disputes drawn by its
     expert from the Dispute Response and Disclosure Logs.
27

28

possessed corroborating information at the time of a consumer's dispute made during the actionable period. The Bureau should not be limited, as Experian suggested during the August 15 call, to specifically querying the databases for each category of alleged violation by serving interrogatories to Experian. This is inconsistent with Fed. R. Civ. P. 34(b)(2)(E)(i) and would be neither effective, nor efficient. *See, e.g.*, *Albert v. Lab'y Corp. of Am.*, 536 F. Supp. 3d 798, 801 (W.D. Wash. 2020) ("A reasonably accessible electronic document that is responsive to a discovery request is no different than a reasonably accessible paper document and must be produced without regard to the parties' agreement to use search terms."); *SolarCity Corp. v. Doria*, No. 16cv3085-JAH (RBB), 2018 WL 467898, at \*6 (S.D. Cal. Jan. 18, 2018) ("The drafters of 34(b)(2)(E) contemplated that parties requesting ESI would be able to organize it themselves—in their own way, to their own satisfactory level of thoroughness, and at their own expense—through the use of text-searching technologies like filtering, grouping, and ordering.") (quoting *Anderson Living Tr. v. WPX Energy Prod., LLC*, 298 F.R.D. 514, 527 (D.N.M. 2014)).

The Bureau has already identified the relevant data that it seeks—the tables and rows associated with the Dispute Response and Disclosure Logs—and Rule 34 permits the Bureau to query this data compilation without having to count such queries (and likely follow-up queries) against its permissible number of interrogatories. But most importantly, Experian's proposed method invites endless delays, as Experian has insisted that the Bureau not simply identify the relevant tables or categories of information that are relevant—something the Bureau has already done—but provide specific searches for Experian to run that go to each potential violation.

In addition to unreasonable delays, having the producing party run these queries would be methodologically unsound. To conduct an analysis of the data

produced by Experian, the Bureau has retained the services of Stout Risius Ross, LLC ("Stout"), "a global financial advisory firm that specializes in Investment Banking, Valuation Advisory, Transaction Advisory, and Disputes, Claims, & Investigations," and its President and Managing Director, Michael J. Petron. Petron Decl. ¶ 1. In Mr. Petron's experience, "[c]omplex queries (such as those likely utilized by Experian to join all the relevant ▉ relational tables . . .) are more prone to errors than simple queries (such as a date limitation on a single table)." *Id.* ¶ 23. Requiring the Bureau to submit all population-wide queries to Experian would give the Bureau "no way of validating the accuracy or completeness of the data extract." *Id.*

Moreover, Experian has confirmed that the data the Bureau seeks is stored in ▉ format. ▉ is a programming language commonly used to work with structured data in relational databases. ▉ allows users to create, modify, and retrieve data by linking tables through column keys, which establish the relationships between different tables." *Id.* ¶ 35. In Mr. Petron's experience, "producing underlying tables from a ▉ database can be a relatively straightforward process," and he identifies "a variety of techniques that could be used to achieve this." *Id* ¶ 40. In light of these facts, Experian's burden objections carry no water.

Critically, Mr. Petron also confirms that complete Dispute Response and Disclosure Log data is necessary to design a valid statistical sample. "Complete data is essential for accurately identifying and addressing outlier values as it provides the necessary context, benchmarks, and distributional understanding. Incomplete data limits the ability to detect anomalies effectively, introduces bias, and can result in misleading conclusions, ultimately compromising the integrity of statistical analyses." *Id.* ¶ 30. In light of these requirements, Experian's proportionality objections lack any merit.

*A Database Copy is Not a Forensic Review of a Computer System*

In their objections and during the conferences on Request No. 1, Experian's counsel relied on commentary to the federal rules of civil procedure and case law concerning forensic examinations, arguing that in order to compel a copy of a database, the requesting party must show discovery violations or similar misconduct. Setting aside the fact that the Bureau has specifically and repeatedly said that it simply wants the Dispute Response and Disclosure Log data—and that the request for a copy of the CAPS database was a way to obtain this data without the apparent burden of pulling information from the live database—Experian is wrong on the law and the facts.

The advisory committee notes to Rule 34 recognize that that there is no "routine right of direct access to a party's electronic information system" and that "[c]ourts should guard against undue intrusiveness resulting from inspecting or testing such systems." Fed. R. Civ. P. 34, advisory committee's notes to 2006 amendment. But this caution concerns *direct access* to an electronic information system for "inspection" and "testing," not the production of full or partial data from a database. Unsurprisingly, that is exactly what the district court decisions cited by Experian concern: *direct access* to electronic devices that would allow access to information that has nothing to do with the case.[9] Indeed, the Bureau has

---

[9] *See United States v. Cal. Inst. of Tech.*, No. CV 18-5964 CAS (RAOx), 2020 WL 13547790, at *7 (C.D. Cal. Nov. 18, 2020) (motion to compel inspection of employee's hard drive); *Lincoln Benefit Life Co. v. Fundament*, No. SACV 18-000260-DOC (JDEx), 2018 WL 6133672, at *2-3 (C.D. Cal. Nov. 7, 2018) (request for "[a]ny and all" of the personal electronic devices that belonged to an insurance holder who was later declared dead); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 314 F. Supp. 3d 931, 934, 938-39 (N.D. Ill. 2018) (request for "forensic examination of the computers" of several witnesses, all located in China); *Bethea v. Comcast*, 218 F.R.D. 328, 329-30 (D.D.C. 2003) (demand to enter defendants' premises, inspect their computer systems and related programs,

been unable to identify any case within this Circuit that treats a database copy as a forensic examination, despite a legion of decisions that quote the applicable committee language concerning direct access.[10] Rather, decisions that have

and copy any information relevant to plaintiff's employment discrimination claims); *McCurdy Grp., LLC v. Am. Biomedical Grp., Inc.*, 9 F. App'x 822, 831 (10th Cir. 2001) (production of all of plaintiff's computer disc drives, including backups, from 1995 to the present).

[10] *See, e.g.*, *Karma Auto. LLC v. Lordstown Motors Corp.*, No. SA CV 20-02104-JVS (DFMx), 2021 WL 4702424, at *2 (C.D. Cal. Sep. 15, 2021) (imaging or copying all devices used for conducting business related to case); *P&B Franchise, LLC v. Dawson*, No. CV-23-00784-PHX-SMB, 2024 WL 326956, at *2 (D. Ariz. Jan. 29, 2024) (forensic imaging); *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10–CV–03428–LHK, 2012 WL 70428, at *3 (N.D. Cal. Jan. 9, 2012) (forensic inspection); *Lee v. Stonebridge Life Ins. Co.*, No. 11–cv–43 RS (JSC), 2013 WL 3889209, at *1 (N.D. Cal. July 30, 2013) (forensic inspection of phone); *Est. of Mario Solis, v. County of Riverside*, No. 5:23-cv-00989-HDV-SPx, 2025 WL 1090945, at *2-3 (C.D. Cal. Mar. 11, 2025) (forensic inspection of Facebook account); *Cefalu v. Holder*, No. 12–0303 TEH (JSC), 2013 WL 4102160, at *2 (N.D. Cal. Aug. 12, 2013) (forensic inspection of personal computer); *AEG Holdco, LLC. v. Vazquez*, No. CV-21-05290-VAP (AGRx), 2022 WL 19076641, at *3 (C.D. Cal. Nov. 15, 2022) (forensic imaging of various electronic devices); *Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-cv-02450-WHO, 2022 WL 6250989, at *2 (N.D. Cal. Aug. 19, 2022) (inspection of non-parties personal electronic device); *Han v. Futurewei Techs., Inc.*, No. 11–CV–831–JM (JMA), 2011 WL 4344301, at *3-4 (S.D. Cal. Sep. 15, 2011) (forensic image of plaintiff's personal computing devices); *In re: Am. Med. Sys., Inc.*, No. 2325, 2016 WL 6666890, at *5 (S.D. W. Va. Nov. 10, 2016) (mirror imaging computers and devices of non-parties); *Citizens Bus. Bank v. Mission Bank*, No. 5:22-cv-01473-FLA (SPx), 2024 WL 3363593, at *3 (C.D. Cal. Mar. 15, 2024) (forensic examination of electronic devices by neutral third party); *Moser v. Health Ins. Innovations, Inc.*, No. 17cv1127-WQH(KSC), 2018 WL 6735710, at *5-6 (S.D. Cal. Dec. 21, 2018), *objections overruled*, No. 3:17-cv-1127-WQH-KSC, 2019 WL 13391059 (S.D. Cal. Apr. 12, 2019) (forensic examination of electronic devices); *Juul Labs, Inc. v. Chou*, No. 2:21-cv-03056-DSF-PDx, 2022 WL 2161062, at *1 (C.D. Cal. Apr. 19, 2022) (same); *Avaya LLC v. Weeks*, No. 2:24-cv-05039-FMO-BFM, 2024 WL 5515353, at *4 (C.D. Cal. Dec. 19, 2024) (same); *PlayUp, Inc. v. Mintas*, 350 F.R.D. 47, 52 (D. Nev. 2025) (forensic examination); *Tong v. State Farm Gen. Ins.*

addressed the production of databases apply the rules for normal discovery, not forensic examinations. *See, e.g.*, *S. Peninsula Hosp., Inc. v. Xerox State Healthcare, LLC*, No. 3:15-cv-000177-TMB, 2019 WL 1873297 (D. Alaska Feb. 5, 2019) (granting motion to compel in part, and allowing requesting party's expert to access responding party's full database, under normal rules of discovery); *see also* Sedona Conference 2025 Database Commentary, at 23-24 (observing that "direct access" is generally disfavored given the possibility of giving access to irrelevant or privileged information, and drawing distinction to producing data base data).

Treating this request as a forensic examination would be particularly inappropriate given that the Bureau has articulated precisely the data it wants, and the critical need for such data as part of the case. This is not analogous to a request for a hard drive that houses all sorts of different information; it is analogous to the Bureau asking for the materials in a folder labeled "consumer dispute log information" in a case challenging Experian's consumer dispute practices. And while the Bureau has repeatedly expressed openness to obtaining this information in different forms—copying the inactive database, exportation of the relevant categories of data, and reducing the time period—Experian has steadfastly refused to discuss potential options or compromises.

While the production of a full database may not be appropriate where it would result in the production of large amounts of wholly irrelevant data, that is not the request that is before the Court. The Bureau has identified precisely the data that it wants: the tables and rows associated with the Dispute Response and

---

*Co.*, No. 2:24-cv-02219-DSF-MAR, 2024 WL 5472414, at *11-13 (C.D. Cal. Dec. 20, 2024) (forensic inspection of defendants' intranet); *Alexis v. Rogers*, No. 15cv691-CAB (BLM), 2017 WL 1073404, at *4-5 (S.D. Cal. Mar. 21, 2017) (forensic examination of plaintiff's computer); *Camp v. L.A. Arena Co.*, No. 5:22-cv-02220-JGB (DTBx), 2024 WL 1634095, at *20 (C.D. Cal. Mar. 22, 2024) (forensic inspection of plaintiff's electronic devices).

Disclosure Logs. As the Bureau has made clear, ███████████████████████████
███████████████████████████████████████████████████. The Bureau is happy to accept production of this data as part of a larger backup copy or on its own—as long as the data is in a usable form—and is also happy to limit its request to July 2, 2020 to the present if doing so would reduce Experian's actual production burden.

This is precisely the result reached by the district court in analogous circumstances in *Manassa v. NCAA*, No. 1:20-cv-03172-RLY-MJD, 2023 WL 1765993 (S.D. Ind. Feb. 3, 2023). There, the court ordered the NCAA to produce data requested by the plaintiff in computer-readable format, even if that meant producing the entire relational database concerning penalties assessed on all Division I teams, where plaintiff's allegations concerned only a small subset of those teams. 2023 WL 176599, at *6. The court observed that the NCAA had failed to support its burden and proportionality objections. Specifically, the court held that the NCAA (like Experian here) had provided (1) "no information at all" regarding the actual burden of producing the entire database, *id.* at *4; (2) no specifics or estimates of the burdens and expenses supporting its disproportionality objection, *id.* at *5; (3) and no information about the feasibility of producing data in a computer-readable format or producing the raw data along with the necessary internal coding information. *Id.* at *4-6.

For the reasons stated above, the Court should overrule Experian's objections and order it to produce all the data contained in the Dispute Response and Disclosure Logs for the period July 2, 2020 to the present within 14 days.

Defendant's Statement of the Dispute

**I.    Standard**

The Ninth Circuit has made clear that "whether or not discovery will be permitted lies within the sound discretion of the trial court." *Vinole v. Countrywide*

26

*Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009) (alterations and citations omitted); *see also Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) ("broad discretion is vested in the trial court to permit or deny discovery"). In determining whether to exercise their discretion, courts consider "the need for discovery, the time required, and the probability of discovery providing necessary factual information." *Doninger v. Pac. Nw. Bell, Inc*., 564 F.2d 1304, 1313 (9th Cir. 1977) (citation omitted).

Where "a request for discovery is overly broad on its face [and/or . . .] when relevancy is not readily apparent, the party seeking the discovery has the burden to show the relevancy of the request." *Bangkok Broad. & T.V. Co., LTD. v. IPTV Corp*., 2010 WL 11523703, at *3 (C.D. Cal. Feb. 12, 2010). The party seeking discovery must satisfy some threshold showing of relevance before discovery is required. *Amazing Ins., Inc. v. DiManno*, 2020 WL 5440050, at *3 (E.D. Cal. Sept. 10, 2020).

Additionally, under the 2015 amendments, "[r]elevancy alone is no longer sufficient to obtain discovery, the discovery must also be proportional to the needs of the case." *Hightower v. S. California, Permanente Grp*., 2022 WL 3574448, at *5 (C.D. Cal. July 18, 2022). Courts have recognized "the need to impose 'reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.'" *Bresk v. Unimerica Ins. Co*., 2017 WL 10439831, at *2 (C.D. Cal. Nov. 16, 2017). Indeed, "[t]he fundamental principle of amended Rule 26(b)(1) is 'that lawyers must size and shape their discovery requests to the requisites of a case.' The pretrial process must provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery." *Id*. (quoting Chief Justice Roberts' 2015 Year–End Report). Thus, the amendments to Rule 26(b) encourage trial courts to exercise their broad discretion to limit and tailor discovery to avoid abuse and overuse, and to actively manage discovery to

accomplish the goal of Rule 1 "'to secure the just, speedy, and inexpensive determination of every action and proceeding.'" *Curiel v. DeJoy*, 2020 WL 6587527, at *1 (C.D. Cal. Sept. 16, 2020).

## II.   **The Parties' Meet and Confer Efforts**

The parties' meet and confer efforts concerning the CAPS database started long before this litigation. Following a supervisory examination in February 2021, the enforcement arm of the Bureau initiated an investigation into EIS's dispute handling processes and procedures. Ball Decl., ¶ 3, Ex. 1 at 10. ███

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

*Id.*, ¶ 4, Ex. 1 at 10. ███████████████

███████████████████████████████████████████

███ *Id.*, ¶ 4, Ex. 1 at 10.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

*Id.*, ¶ 5, Ex. 1 at 10. ██████████

███████████████████████████████████████████

███████████████████████████████████████████

*Id.*, ¶ 5, Ex. 1 at 10.

███████████████████████████████████████████

███████████████████████████████████████████

███ . *Id.*, ¶ 6.

28

1

2

3    *Id.*, ¶ 7, Ex. 1 at 9-11, Ex. 2.

4

5    *Id.*, ¶ 8, Ex. 1 at 11,

6    Ex. 2.

7

8

9

10

11

12    *Id.*, ¶ 8, Ex. 1 at 11, Ex. 2 at 21.

13    Like it does here,

14    *Id.*, ¶ 9, Ex. 1 at 11-12.

15

16    Ball

17    Decl., ¶ 9, Ex. 1 at 12                .

18

19

20

21    *Id.*, ¶ 9, Ex. 1 at 13.

22

23    *Id.*, ¶ 9, Ex. 1 at 13.    *Id.*,

24    ¶ 10, Ex. 1 at 13.

25

26    *Id.*, ¶ 10, Ex. 1 at 13.

27

28



Ball Decl., ¶ 10, Ex. 1 at 13.

Ball Decl., ¶ 11.

*Id*.

Ball Decl., ¶ 11.

, the Bureau now claims that it needs the entire CAPS database. Apparently nothing short of all information concerning how EIS processed every dispute for the past six years will do.

In response to Plaintiff's first RFP—which requested a copy of CAPS—EIS . Ball Decl., ¶ 12; *see response supra.* Immediately after EIS responded, the Bureau requested to confer regarding RFP No. 1 and demanded that EIS include "a person with particular knowledge of the cold storage backup of the CAPS database the parties discussed during the course of the investigative phase of this case," without citation to any authority. Ball Decl., ¶ 14, Ex. 3 at 66. In response, EIS requested legal support for the Bureau's position that it was entitled to the CAPS database and declined to have a non-lawyer attend. Ball Decl., ¶ 15, Ex. 3 at 65. The Bureau provided none. *Id*., ¶ 15, Ex. 3 at 63-65.

During the parties August 15, 2025 conferral, EIS repeatedly asked the Bureau to provide any legal authority to support that the production of the CAPS database was proper, but the Bureau did not provide any and instead focused on whether EIS could produce the CAPS database in a format suitable for the Bureau. *Id*., ¶ 16.

Despite the Bureau offering no authority to counter EIS's objections, EIS nevertheless informed the Bureau that it would speak with its client about its data production capabilities. *Id.*, ¶ 16.

The Bureau followed up this conferral with a short letter on September 4, 2025, which acknowledged its prior ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ *Id.*, ¶ 17, Ex. 4 at 17. The Bureau then claimed that its request for a copy of the database was aimed ████████ ███████████████████████████████████ yet provided no authority addressing the threshold question of whether it was entitled to the database. *Id.*, ¶ 17, Ex. 4 at 17.

The parties agreed to confer again on October 27, 2025. EIS declined to include any non-lawyers, particularly when the Bureau had already ██████████ ██████████████████████████████████████ and nothing in the Federal Rules requires technical experts to be present. *Id.*, ¶ 18, Ex. 5 at 76-78; *see Smith v. Premiere Valet Servs., Inc.*, 2020 WL 7034346, at *5 (C.D. Cal. Aug. 4, 2020) (describing meet and confer process without reference to technical experts).[11] Like the other conferrals, EIS asked the Bureau for legal support for its position, but none was provided. Ball Decl., ¶ 19. EIS also asked the Bureau if it intended to narrow its request, but the Bureau declined. *Id.*, ¶ 19. The Bureau instead peppered EIS's counsel with hyper-technical database questions, which EIS's counsel provided comprehensive answers to most of (e.g., size, date range, type of data stored, etc.). *Id.*, ¶ 20. And for those questions which it could not answer, EIS asked the Bureau to put them in writing so that EIS's counsel could discuss with its client.

---

[11] Oddly enough, for all its consternation about technical experts, the first time the Bureau disclosed that it had retained Mr. Petron was when it served its portion of the joint stipulation to EIS. Mr. Petron also did not attend any meet and confers.

*Id.*, ¶ 21. EIS's counsel also offered to present its technical expert for a deposition, but the Bureau declined. *Id.*, ¶ 21.

In accordance with EIS's request, the Bureau posed ten questions concerning the CAPS database on November 3, 2025. Ball Decl., ¶ 22, Ex. 5 at 75-76. While EIS was not required to answer these questions in detail, it provided a fulsome response on November 27, 2025. *Id.*, ¶ 23, Ex. 5 at 74-75. EIS explained the architecture and capabilities of the CAPS database, including the underlying engine and number of relational tables. *Id.*, Ex. 5 at 74. It also explained ███████

████████████████████████████████████████████

█████████  *Id.*, Ex. 5 at 74. ████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████ .

*Id.*, Ex. 5 at 74-75.

The Bureau never responded to EIS's email. *Id.*, ¶ 24. Nor did it request a further meet and confer. *Id.* Instead, more than two months later, it served this joint stipulation on EIS without seeking to address any issue raised by EIS or provide any authority supporting its rationale for seeking the database. *Id.* If anything, this record demonstrates that the Bureau did not meet in good faith as nothing short of the full contents of the CAPS database would have been sufficient for the Bureau.

**III.        The Bureau's Request for the CAPS Database is Improper**

The Bureau's request is extraordinary. ██████  ██████  ██  ████████

█████████████████████████████████—during which EIS did not have the protections of the Federal Rules of Civil Procedure—the Bureau still needs more information to uncover EIS's alleged violations. Indeed, the Bureau unabashedly requests the production of EIS's entire CAPS database so that it can review every single dispute that EIS processed since 2020 in order to identify each time EIS purportedly violated the FCRA in processing a dispute. The Bureau's

32

request demonstrates that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮, the Bureau is unable and unwilling to issue a targeted request to identify relevant disputes, and instead resorts to simply seeking all dispute information. This is far from the "precise" request that the Bureau claims it is and runs counter to the rules of civil procedure.

The Bureau does not—and cannot—dispute that EIS processed the vast majority of disputes in the past six years correctly. A review of the CAPS database would therefore involve reviewing large amounts of wholly irrelevant data. *See Myles v. Cnty. of San Diego*, 2016 WL 6070328, *4 (S.D. Cal. Oct. 17, 2016) (denying discovery requests that "are extremely overbroad, would produce large amounts of irrelevant information, and are not tailored to the needs of this case"); *Villa v. Torres*, 2025 WL 3718372, at *1 (C.D. Cal. Dec. 12, 2025) ("Discovery requests that seek irrelevant information are inherently unduly burdensome."). ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Weinstein Decl. Ex. E (Supp. Response to Interrogatory No. 5). ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ Despite this fractional return, the Bureau asserts that it needs to review all disputes to support its claims, and it does so without addressing the sea of irrelevant information contained in the database, let alone consider the gross intrusion on consumer privacy. *See Henson v. Turn, Inc.*, 2018 WL 5281629, at *5 (N.D. Cal. Oct. 22, 2018) ("Courts and commentators have recognized that privacy interests can be a consideration in evaluating proportionality" (collecting cases));

*Lineberry v. Addshoppers, Inc.*, 2024 WL 4707986, at \*7 (N.D. Cal. Nov. 6, 2024) (denying motion to compel seeking information related to every website visited by consumers due to privacy concerns). The Bureau instead charges forward in its pursuit of nothing sort of the full database.

This is a textbook example of an unwarranted and harassing "fishing expedition." *See Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 531 (2009) ("Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through . . . records for evidence of some unknown wrongdoing."); *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1072 (9th Cir. 2004) ("District courts need not condone the use of discovery to engage in 'fishing expedition[s].'"); *see also Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (holding that the broad construction of relevancy "should not be misapplied so as to allow fishing expeditions in discovery."); *Risto v. Screen Actors Guild-Am. Fed'n of Television & Radio Artists*, 2020 WL 2225376, at \*6 (C.D. Cal. Jan. 8, 2020) ("[T]he Court will not permit what appears to amount to a fishing expedition into documents with little to no apparent probative value."); *Mailhoit v. Home Depot U.S.A., Inc.*, 2012 WL 12884129, at \*2 (C.D. Cal. Sept. 4, 2012) ("Where discovery requests seek information which bears no relationship to the subject matter of the complaint, courts appropriately deny enforcement.").

The Supreme Court rejected a similar request by the FTC long ago. *FTC v. Am. Tobacco Co.*, 264 U.S. 298, 305 (1924). According to the FTC, it had "an unlimited right of access to the respondents' papers with reference to the possible existence of practices in violation of section 5." *Id.* In rejecting the FTC's argument, Justice Holmes explained that it would be "contrary to the first principles of justice to allow a search through all the respondents' records [sic], relevant or irrelevant, in the hope that something will turn up." *Id.* at 306; *see also Dwoskin v. Bank of Am., N.A.*, 888 F.3d 117, 121 (4th Cir. 2018) ("Plaintiffs are not entitled to endless discovery to search for evidence for their claims."). The same holds true here. *See*

*also John B. v. Goetz*, 531 F.3d 448, 459-60 (6th Cir. 2008) (explaining that it is improper to "require[e] the mirror imaging of computers where the request is extremely broad in nature and the connection between the computers and the claims . . . are unduly vague or unsubstantiated in nature") (collecting cases).

As in *American Tobacco*, the Bureau's request appears rooted in nothing more than "the possibility that [the CAPS database] may disclose evidence of [wrongdoing]." Indeed, the request is "so broad so as to be in the nature of a 'fishing expedition,'" and is thus improper. *Peters v. U.S.*, 853 F.2d 692, 700 (9th Cir. 1988); *Am. Tobacco Co.*, 264 U.S. at 307; *Gen. Ins. Co. v. Equal Emp. Opportunity Comm'n*, 491 F.2d 133, 136 (9th Cir. 1974); *see also Cuomo*, 557 U.S. at 531; *Callaway v. Mercedes-Benz USA, LLC*, 2016 WL 11744740, at *1 (C.D. Cal. Mar. 9, 2016) (McCormick, J.) ("[d]iscovery must be narrowly tailored ... and must not be a fishing expedition"). Such a request goes well-beyond what is proper under the Federal Rules of Civil Procedure and even the Bureau's investigatory authority. *See Consumer Fin. Prot. Bureau v. Source for Pub. Data, L.P.,* 903 F.3d 456, 460 (5th Cir. 2018) ("[s]imply put, the CFPB does not have 'unfettered authority to cast about for potential wrongdoing.'" quoting *In re Sealed Case (Admin. Subpoena)*, 42 F.3d 1412, 1418 (D.C. Cir. 1994))). Indeed, rather than seeking discovery that would be necessary or helpful to determine whether EIS's dispute handling practices are lawful, Plaintiff's discovery requests amount to a comprehensive inquiry into EIS's internal systems. But the Bureau does not point to any "sufficiently important benefit in Plaintiff's discovery of the information at issue that outweighs the burden to [EIS] identified"—as shown below. *Barnum v. Equifax Info. Servs., LLC*, 2018 WL 1245492, at *2 (D. Nev. Mar. 9, 2018) (citing *Roberts v. Clark Cnty. Sch. Dist.*, 312 F.R.D. 594, 603 (D. Nev. 2016); *see also Regan–Touhy v. Walgreen Co.*, 526 F.3d 641, 648-49 (10th Cir. 2008) ("[C]ourts are properly encouraged to weigh the expected benefits and burdens posed by particular discovery requests (electronic and

1    otherwise) to ensure that the collateral discovery disputes do not displace trial on the
2    merits as the primary focus of the parties' attention.").

3          In addition to being overbroad on its face, the production of the entire CAPS
4    database for the Bureau's review is a drastic and unwarranted measure. As the Rule
5    34 Advisory Committee Notes recognize, there is no "routine right of direct access
6    to a party's electronic information system." Fed. R. Civ. P. 34, Advisory Committee
7    Notes—2006 Amendment. Thus, "[c]ourts should guard against undue intrusiveness
8    resulting from inspecting or testing such systems." *Id*. Following this guidance,
9    "[c]ourts are generally reluctant to permit a party unlimited access to an electronic
10   device in the absence of a discovery violation or the owner's consent." *United States
11   v. California Inst. of Tech*., 2020 WL 13547790, at *7 (C.D. Cal. Nov. 18, 2020);
12   *Lincoln Benefit Life Co. v. Fundament*, 2018 WL 6133672, at *3 (C.D. Cal. Nov. 7,
13   2018) (collecting cases and finding plaintiff's requests for unlimited access to
14   electronic devices was not supported by the record). And for good reason.
15   "[F]orensic inspection is an extraordinary remedy that requires substantial support,
16   such as when serious questions exist both as to the reliability and the completeness
17   of materials produced." *California Inst. of Tech.*, 2020 WL 13547790, at *7 (clean
18   up and collecting cases); *see also Motorola Solutions, Inc. v. Hytera Commc'ns
19   Corp.*, 314 F. Supp. 3d 931, 939 (N.D. Ill. 2018) ("Forensic examination is generally
20   regarded as a drastic step even in general discovery."); *Bethea v. Comcast*, 218
21   F.R.D. 328, 329-330 (D.D.C. 2003) ("In the context of computer systems and
22   computer records, inspection or seizure is not permitted unless the moving party can
23   demonstrate that the documents they seek to compel do, in fact, exist and are being
24   unlawfully withheld."); *McCurdy Grp. v. Am. Biomedical Grp., Inc.*, 9 F. App'x 822,
25   831 (10th Cir. 2001) (describing forensic review as "drastic discovery measure").
26   The Bureau does not and cannot meet the standard required to support its "drastic
27   discovery request." *California Inst. of Tech.*, 2020 WL 13547790, at *8.
28

Recognizing that forensic examinations are disfavored, the Bureau claims it merely seeks a "copy" of, rather than entry into, EIS's databases. This is a distinction without a difference. The Bureau wants free range within EIS's dispute database to rummage through it in the hopes it can somehow identify additional alleged violations. Courts regularly deny requests for free-access to copies of electronic systems on the same grounds. *See Han v. Futurewei Techs., Inc.*, 2011 WL 4344301 (S.D. Cal. Sept. 15, 2011) (denying request to copy hard drive of personal computing devices since "[t]he authorities considered by the Court demonstrate that courts generally permit mirror imaging only when a responding party's discovery responses have been incomplete or inconsistent"); *see also Slater & Assoc. Ins., Inc. v. Roork*, 2007 WL 3026944 (D. Ariz. Oct. 16, 2007) (allowing mirror imaging of Defendants' hard drives only if Defendants failed, through the discovery process, to return company documents and to provide an affidavit avowing that all company materials had been returned).[12] As the Advisory Committee explained, "[c]ourts should guard against undue intrusiveness resulting from inspecting or testing such systems." Fed. R. Civ. P. 34, Advisory Committee Notes—2006 Amendment. This is particularly true where, as here, Bureau's requests are premised entirely on counsel's disbelief of EIS's representations regarding its system capabilities. *See John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008) (finding that "mere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant drastic electronic discovery measures" (citing *McCurdy Group, LLC v. Am. Biomedical*

---

[12] The cases cited by Bureau involved denials of motions to compel forensic examinations or device imaging. *See, e.g.*, *Karma Auto. LLC v. Lordstown Motors Corp.*, 2021 WL 4702424, at *2 (C.D. Cal. Sep. 15, 2021) (denying request to compel review of forensic images and denied motion to compel as overbroad and not proportional); *Citizens Bus. Bank v. Mission Bank*, 2024 WL 3363593, at *3 (C.D. Cal. Mar. 15, 2024) (denying motion to compel forensic examination of devices and backup system).

*Group, Inc.*, 9 Fed. Appx. 822, 831 (10th Cir. 2001)); *Lawyers Title Ins. Corp. v. U.S. Fid. & Guar. Co.*, 122 F.R.D. 567, 570 (N.D. Cal. 1988) ("The mere possibility that a party might not produce all relevant, unprotected documents, is not a sufficient basis for ordering such a party to disclose its entire computerized system of information management."); *see also* The Sedona Conference, *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production* (2d ed. 2007), Cmt. 6.a. ("A producing party should not be required to undertake more heroic efforts merely because the party seeking discovery is suspicious of the efforts undertaken by the producing party.").[13]

Simply put, the Bureau's demand to copy the entire CAPS database crosses the line. The Bureau has "made no showing that they are entitled to access to [EIS's] database[] or a copy of the[] database[]." *Brunston v. Bayer Healthcare Pharms.*,

---

[13] The Bureau cites one case in the Ninth Circuit that permitted the copy of a database. *S. Peninsula Hosp., Inc. v. Xerox State Healthcare, LLC*, 2019 WL 1873297 (D. Alaska Feb. 5, 2019). But "[t]he crux of [the plaintiff's] allegations [was] that Conduent implemented the Health Enterprise database prematurely, resulting in the erroneous denial or delay of large numbers of payments and forcing South Peninsula to 'fund operations from other sources' and 'expend supplementary resources ... to troubleshoot why valid claims had become backlogged.'" *Id.* at *1. The database was therefore central to the claims in *S. Peninsula*, which is not the case here. This case also differs from *S. Peninsula* because EIS has already produced scores of discovery, whereas the defendant in *S. Peninsula* "ha[d] declined to provide any materials as to Plaintiffs' class action claims, which [was] essentially going to defeat class certification in advance." *Id.* at *7.

*Manassa v. Nat'l Collegiate Athletic Ass'n* is likewise distinguishable. 2023 WL 1765993 (S.D. Ind. Feb. 3, 2023). First, in contrast to EIS here, the NCAA "provided no information at all regarding what the actual burden of producing the additional information sought by Plaintiff would be." *Id.* at *4. Second, the parties did not particularly dispute the relevance of the information sought; rather, the dispute centered on producing the information in PDF format vs. "computer-readable format." *Id.* at *3-4. The Court required the production to be in the latter format. *Id.*

*Inc.*, 2014 WL 12587032, at *5 (C.D. Cal. May 16, 2014). Nor has it made any serious attempt to narrow its search. Instead, it throws its hands up and demands that EIS produce every single item of any dispute from the past six years. The Bureau should not benefit from its unwillingness to narrow its demand. This is plainly improper.

**IV.    The Bureau's Request Would Cause Undue Burden or Result in The Production of Worthless Data**

Setting aside that the Bureau's request is improper and unwarranted, it will not result in the production of usable discovery. *See* FRCP 34(b)(2)(E)(ii) ("a party must produce [electronically stored information] in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms"). ███████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████ These issues further underscore that the Bureau's request is plainly improper and should be denied.

As Mr. Farnham explains, ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████. Declaration of Matthew Farnham ("Farnham Decl."), ¶ 16.

The Bureau does not dispute that this would cause an undue burden. ████

████████████████████████████████████████████████

*Id.*, ¶ 18. ███████████████

████████████████████████████████████████████████

████ *Id.*, ¶ 29; *cf. OpenTV v. Liberate Technologies*, 219 F.R.D. 474 (2003) (holding that source code requiring 1.25 to 1.5 hours per extraction for approximately 100 versions, totaling 125-150 hours of work, constituted inaccessible ESI due to the "unduly burdensome and potentially expensive" time requirement); *Elkharwily v. Franciscan Health Sys.*, 2016 WL 4061575, at *2-3 (W.D. Wash. July 29, 2016) (finding undue burden based on estimate of "$157,500 in costs to retrieve, restore, and review the backup tapes for responsive archived emails"). And, even then, ███████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Farnham Decl., ¶ 29 n.1; *see also id.*, ¶ 17. There can therefore be no question that requiring EIS to export information about every dispute for the last six years is unduly burdensome. *Cf. Paramount Pictures Corporatione et al.*, v. *Replay TV*, 2002 WL 32151632, at *2 (C.D. Cal. May 30, 2002) (denying request for customer-use data that would require a months-long software development effort because compelling it would be "contrary to law"); *James v. UMG Recordings, Inc.*, 2013 WL 5978322 (N.D. Cal. Nov. 8, 2013) (denying motion to compel that would require defendant to "reprogram[] . . . its royalty database, and create[] . . . new software to extract the information Plaintiffs seek"); *Dilley v. Metro. Life Ins. Co.*, 256 F.R.D. 643, 645 (N.D. Cal. 2009) (finding undue burden because Defendant would be unable to extract statistical information

"without substantial difficulty and expense" since there is no mechanism in the electronic database to query Plaintiff's desired information).

Recognizing the impropriety of its request, the Bureau requests that EIS simply produce ████████████████████████████████████████████ ████████████████████ Farnham Decl., ¶ 19. But doing so would not provide the Bureau with the information it seeks. *Id*. To begin, ██████████████████████ ████████████████████████████████ *Id.*, ¶ 20, Ex. 1 (illustrating ██████████ ████████████████████████████████████████████████████████ ██████). Producing information in an unreadable format runs counter to Rule 34, even if that is the format requested by the Bureau. *See Griffin v. City of Los Angeles*, 2025 WL 1721994 (C.D. Cal. May 9, 2025) (finding that defendant who produced "tables of raw data" had a "responsibility under Rule 34(b)(2)(E) to provide the data in the form it is normally maintained or in some other reasonably usable form"); *see also Corker v. Wholesale*, 2020 WL 1987060, at *1 (W.D. Wash. Apr. 27, 2020) (explaining that FRCP 34 requires that EIS be produced in a "reasonable usable form" that enables the requesting party "to use the information efficiently").

████████████████████████████████████████ Farnham Decl., ¶ 21, Ex. 2 (illustrating ██████████████████████████████ ██████████████████████████ ). To properly review the data, ██████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████. *Id.*, ¶ 22. Neither the Bureau nor its expert even purports to have the requisite expertise to perform these functions. As Mr. Petron concedes, the Bureau lacks any understanding or knowledge about EIS's proprietary fields of information and software. *Id.*, ¶¶ 23-28 (citing Petron Decl. at ¶¶ 9, 14, 16, 37). Thus, ████████████████████████████████████████

41

1    ███████████████████████████████████████████. *Id.*, ¶ 23. This alone

2    demonstrates that producing ████████ would be nothing but an exercise in

3    futility. *Id.*

4         In short, the Bureau finds itself between a rock and a hard place.  It knows

5    that requesting EIS to export the CAPS database in a readable format is

6    extraordinarily burdensome and therefore improper.  But its solution of requesting

7    that EIS produce a copy of the ████████████████████████████████████

8    ██████████████████████████. As such, the Bureau's motion to compel

9    should be denied.

10

11    Dated: February 20, 2026        Respectfully submitted,

12
        */s/ Max Weinstein*
13                       Max Weinstein, Mass. Bar No. 600982
        Email: max.weinstein@cfpb.gov
14                       CONSUMER FINANCIAL
        PROTECTION BUREAU
15                       1700 G Street, NW
16                       Washington, DC 20552
        Phone: (202) 435-9172
17                       Fax: (202) 435-5468

18                       *Attorney for Plaintiff Consumer Financial*
19                       *Protection Bureau*

20                       */s/ Richard J. Grabowski*
21                       Richard J. Grabowski, Bar No. 125666
        rgrabowski@jonesday.com
22                       JONES DAY
23                       3161 Michelson Drive, Suite 800
        Irvine, California  92612.4408
24                       Telephone:  +1.949.851.3939
25                       Facsimile:   +1.949.553.7539

26                       *Attorney for Defendant Experian*
27                       *Information Solutions, Inc.*

28

1

## CERTIFICATION PURSUANT TO L.R. 5-4.3.4(2)(i)

All other signatories listed, and on whose behalf the filing is submitted concur in the filing's content and have authorized the filing.

/s/ *Max Weinstein*

Max Weinstein, Mass. Bar No. 600982
Email: max.weinstein@cfpb.gov
CONSUMER FINANCIAL
PROTECTION BUREAU
1700 G Street, NW
Washington, DC 20552
Phone: (202) 435-9172
Fax: (202) 435-5468