Max Weinstein, Mass. Bar No. 600982
Email: max.weinstein@cfpb.gov
Admitted *Pro Hac Vice*
Tracy Hilmer, D.C. Bar No. 421219
Email: tracy.hilmer@cfpb.gov
Admitted *Pro Hac Vice*
CONSUMER FINANCIAL
PROTECTION BUREAU
1700 G Street, NW
Washington, DC 20552
Phone: (202) 435-9172 (Weinstein)
Phone: (202) 435-7459 (Hilmer)
Fax: (202) 435-5468

Chung H. Han, Cal. Bar No. 191757
Email: chung.han@usdoj.gov
U.S. ATTORNEY'S OFFICE
300 N. Los Angeles St., Suite 7516
Los Angeles, CA 90012
Phone: (213) 894-0474
Fax: (213) 894-7819

*Attorneys for Plaintiff*
*Consumer Financial Protection Bureau*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau, | Case Number: 8:25−cv−00024−MWC−DFM |
| *Plaintiff,* | |
| v. | **DECLARATION OF MAX WEINSTEIN IN SUPPORT OF JOINT STIPULATION** |
| Experian Information Solutions, Inc., | |
| *Defendant.* | |

DECLARATION OF MAX WEINSTEIN

I, Max Weinstein, having personal knowledge of the facts set forth below, declare:

1. I am an Enforcement Attorney employed by the Plaintiff, the Consumer Financial Protection Bureau (the "Bureau").

*The Bureau's Investigation of Experian's Consumer Dispute Practices*

2. On October 29, 2021, the Bureau served a civil investigative demand pursuant to section 1052 of the Consumer Financial Protection Act of 2010 and 12 C.F.R. Part 1080 on Defendant Experian Information Solutions, Inc. ("Experian").

3. ███████████████████████████████████████████ ███████████████████████████████████████████ ███████ The Bureau's investigation formed the basis of the allegations in this present action and identified the existence, if not the full scope, of the violations of law alleged therein.

4. On May 2, 2022, the Bureau served a second civil investigation demand on Experian (the "Second CID"). *See* Exhibit A, Second CID.

5. The Second CID requested that ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████

6. In response to this request, Experian produced ███████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████ ██ ████████████████████████████████ ███████████████████████████████████████████,

1  █
2  ██ ██
3  ██
4  ██
5  ██
6  ██
7  ██ *See* Exhibit B, Investigational Hearing Transcript of Kimberly Cave, June
8  21, 2023, at 18-19.
9      9.   CAPS can produce at least two reports for any given consumer
10 dispute: the Dispute Response Log, ██
11 ██
12 ██, and the Disclosure Log, ██
13 ██ *Id.* at 53-55, 126-
14 27.
15     10.  On July 11, 2023, the Bureau sent Experian another civil investigative
16 demand (the "Seventh CID") ██
17 ██
18 ██
19 ██
20 ██ ██
21 ██
22 ██
23 ██ ██
24 ██
25 ██
26 ██
27 ██
28 ██

3
DECLARATION OF MAX WEINSTEIN

1  ████████████████████████████████████████
2  ████████████████████████████████████████
3  ████████████████████████████████████████
4  ████████████████████████████████████████
5  ████████████████████████████████████████
6  ████████████████████████████████████████
7  ████████████████████████████████████████
8  ██████████████████████████████████ *Id.*
9         13.    In ████████████████████████
10 ████████████████████████████████████████
11 ████████████████████████████████████████
12 ████████████████████████████████████████
13 █████████████████████████████
14         14.    █████████████████████████
15 ████████████████████████████████████████
16 ████████████████████████████████████████
17 ████████████████████████████████████████
18 ██
19         15.    On September 8, 2023, Experian agreed to comply with the Seventh
20 CID as modified. ███████████████████████
21 ████████████████████████████████████████
22 █████████████████████████
23     █  █████████████████████████████████
24 ████████████████████████████████████████
25         17.    █████████████████████████
26 ████████████████████████████████████████
27 ████████████████████████████████████████
28 ████████████████████████

4
D<small>ECLARATION OF</small> M<small>AX</small> W<small>EINSTEIN</small>

18. For instance, the Bureau alleges in the SAC that "Experian frequently receives furnisher responses that contain data that is either illogical or facially and internally inconsistent, but it still accepts the furnisher's response without further reinvestigation into the dispute." SAC ¶ 57.

19. As an example of this allegation, the Bureau further alleges that "Experian receives [furnisher] responses with inconsistent information, such as indicating a consumer's overdue balance is *greater* than the total amount due." *Id.* ¶ 58.

20. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████

21. After concluding its civil investigation, the Bureau commenced this lawsuit against Experian on January 7, 2025.

*The Present Discovery Dispute*

22. The Bureau served its First Requests for the Production of Documents on June 20, 2025. *See* Exhibit F, Plaintiff's First Request for Production of Documents. The first of the Bureau's requests demanded "[a] complete copy of the Consumer Assistance Processing System (CAPS) database, not limited to the Applicable Period, including all fields and other information contained therein." *Id.* at 5. The request further specified that it would be sufficient for Experian to produce "the most recent complete copy of the CAPS database that is held offline, i.e. in cold storage." *Id.*

23. On July 16, 2025, Experian requested a two-week extension of its deadline to respond and the Bureau agreed.

24. On July 18, 2025, the Bureau, anticipating the need for discussions regarding the production of ESI, inquired by e-mail regarding Experian's availability between August 12 to 15 to meet and confer. *See* Exhibit G, Bureau July 18, 2025 E-Mail. Experian did not respond.

25. On August 4, 2025, Experian objected to the entirety of Request No. 1 on numerous grounds, including the claim that such a request is only permissible in the context of a forensic inspection. Experian flatly refused to search for or produce any ESI responsive to the request. *See* Exhibit H, Experian's Response to Request No. 1 of the Bureau's First Requests for the Production of Documents.

26. On August 7, 2025, the Bureau promptly renewed its request to meet and confer regarding Request No. 1 and further requested that "both parties [] include individuals with sufficient technical expertise on the call, and, in Experian's case, a person with particular knowledge of the cold storage backup of the CAPS database the parties discussed during the course of the investigative phase of this case." *See* Exhibit I, Bureau Aug. 7, 2025 E-Mail.

27. Experian responded the same day, asserting that the Bureau's requests were "patently overbroad" and refusing to meet and confer until "after the Bureau complies with Local Rule 37-1 by stating its position for each issue and providing any legal authority the Bureau believes is dispositive." *See* Exhibit J, Experian Aug. 7, 2025 E-Mail.

28. On August 8, 2025, the Bureau made a third request to meet and confer. *See* Exhibit K, Bureau Aug. 8, 2025 E-Mail.

29. Experian ultimately agreed to meet and confer on August 15, 2025, but refused to produce any person with technical expertise, stating that "we will not be having any non-lawyers on our side attend." *See* Exhibit L, Experian Aug. 12, 2025 E-Mail.

30. The parties met and conferred on August 15, 2025, but reached no agreement on Request No. 1. Bureau counsel explained that Request No. 1 sought the contents of the Dispute Response and Disclosure Log reports for a reasonable time period and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Because of the absence of a technical expert, Experian's counsel was unable to address whether copying a cold-storage backup would be feasible or less burdensome, and could not answer any other technical questions regarding its databases.

31. Experian's counsel represented that it would confer with their client regarding the Bureau's technical questions and advise the Bureau regarding Experian's responses. But Experian did not do so.

32. On September 4, 2025, the Bureau inquired by e-mail regarding the questions Experian's counsel had been unable to answer at the August 15, 2025 meet and confer. *See* Exhibit M, Bureau Sep. 4, 2025 Letter. Experian again ignored the Bureau's correspondence and did not respond.

33. Experian's refusal to respond to the Bureau's inquiries required the Bureau to send a pre-motion letter pursuant Local Rule 37-1, which the Bureau sent by email on October 14, 2025. *See* Exhibit N, Bureau Oct. 14, 2025 Letter. The Bureau again stated that it was seeking the data from the Dispute Response and Disclosure Logs, and that it was open to obtaining either the full data set (via a data export or backup copy) or data that covered a shorter time period. The Bureau requested to meet and the Bureau again requested the presence of an Experian representative with relevant technical expertise at the meet and confer. *Id.*

34. The parties met and conferred by videoconference on the first day Experian was available, October 27, 2025. The Bureau included three of its data scientists on the call, but Experian again refused to include any person with technical expertise at the meet and confer, and Experian was again unable to

1  answer the Bureau's technical questions.

2  35. The Bureau reiterated that it was seeking the same type of data it had
3  obtained in the investigation—the Dispute Response and Disclosure Log data—
4  and that it was open to receiving an export of this data covering a reasonable time
5  period. Experian was unable to answer any questions related to this specific data.
6  Experian was unable to explain whether this data was segregated, to estimate the
7  size of the data, to explain how the data was structured or the role of the
8  proprietary software (e.g., front-facing application or backend), or even to identify
9  the database engine. It was also unable to answer questions about potential
10 compromises—whether the same constraints existed on its ability to export data;
11 whether it would be feasible for Experian to export by date range; what the burden
12 for exporting the seven years' of log information would be, or whether the burden
13 scales with the size, date, locale of storage, or other factors.

14 36. Experian instead suggested that the Bureau could either pose technical
15 questions at a Rule 30(b)(6) deposition or send written questions by email.

16 37. The Bureau sent its unanswered questions by email to Experian on
17 November 3, 2025. The Bureau asked, among other things, about the size and
18 number of rows/columns for the Dispute Response and Disclosure Logs, the
19 format of the log data, whether data could be exported by date range, the extent to
20 which the same constraints on exporting from the live database still applied,
21 whether the burden of production scaled with particular characteristics, and the
22 nature of any production burden. *See* Exhibit O, Bureau Nov. 3, 2025 Email.

23 38. Experian replied on November 7, 2025, stating that it would provide
24 responses the following week. *See* Exhibit P, Experian Nov. 7, 2025 E-Mail.

25 39. Experian did not respond until November 25, 2025, and it failed to
26 respond to important questions, including whether the Dispute Response and
27 Disclosure Log data are segregated within Experian's databases, the approximate
28 size of that data, how the data is structured, the role of proprietary software (e.g.,

front-facing application or backend), and whether it would be more expeditious for Experian to export by date range.[1] ███████████████████████████████ ███████████████████████████████████████████████████. Experian represented in its e-mail ████████████████████████████████ ████████████████████████████████████████████████████ █████ In other words, ███████████████████████████████ ███████████████████████████████████████████████████ ████████████████████ And Experian evaded the question whether the Dispute Response and Disclosure Log datasets within the larger CAPS database can be copied or exported. *See* Exhibit Q, Experian Nov. 25, 2025 E-Mail.

*The Bureau's Need for Complete Data Sets*

40. Experian's proposal during the recent meet and confers that the Bureau pose data queries in interrogatories or via a Rule 30(b)(6) deposition would impede, rather than facilitate, discovery. Asking Experian to query its own databases will not only force the Bureau to expend its limited interrogatories and depositions, but will also result in further delay and objections. Where the violation alleged by the Bureau can be identified by a query, the Bureau should be permitted to query the relevant datasets directly, using queries it has designed and modified as necessary. The Bureau has demonstrated that it can and will so once provided the relevant data.

41. Moreover, the Bureau has alleged violations that cannot be readily identified by a simple query. For instance, based on evidence produced in the investigation, the Bureau alleges that Experian accepted furnisher responses indicating that "a consumer first became delinquent on an installment debt a month

---

[1] During the conference, Experian insisted that the Bureau propose a more narrow request. The Bureau explained that it had expressed openness to a shorter time period, but that Experian's failure to provide basic information made it impossible to determine whether a shorter time period was reasonable or the duration of such a time period.

9

DECLARATION OF MAX WEINSTEIN

*after* the consumer had paid the account to a zero-dollar balance." SAC ¶ 58. Identifying the full scope of this violation will require reviewing the furnisher's payment history and comparing it to the balance and past-due status, likely on a dispute-by-dispute basis. Given the volume of Experian's disputes, this will necessitate a sample analysis that can be extrapolated in order to determine the full scope. As explained more fully in the Declaration of Michael Petron, designing a statistically valid sample will require access to the full CAPS dataset for the relevant population of disputes.

Dated: February 2, 2026

Respectfully submitted,

*/s/ Max Weinstein*

Max Weinstein
*Consumer Financial Protection Bureau*